GERALD HESSE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DUANE MEARES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hesse v. Commissioner
Docket No. 46095-86; 46136-86
United States Tax Court
T.C. Memo 1989-515; 1989 Tax Ct. Memo LEXIS 515; 58 T.C.M. (CCH) 199; T.C.M. (RIA) 89515; September 25, 1989
Robert Selvidge, for the petitioners. Elizabeth Groenewegen, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: In these consolidated cases, respondent determined the following deficiency and additions to income tax against Gerald Hesse (Mr. Hesse) for the calendar year 1981: Additions to Tax
Deficiency
Sec. 6654(a)[1]
Sec. 6653(b)(1)
Sec. 6653(b)(2)
$ 19,503.10
$ 1,256.03
$ 9,751.55
*
In *517 his answer, respondent asserts alternatively that if we find no fraud on the part of Mr. Hesse, the following additions to tax should apply: Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6651(a)(1)
$ 975.16
*
$ 4,875.77
Respondent also determined the following deficiency and additions to income tax against Duane Meares (Mr. Meares), for the calendar year 1981: Additions to Tax
Deficiency
Sec. 6654(a)
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
$ 19,503.10
$ 1,282.00
$ 4,875.77
$ 975.16
*
Initially, we note that respondent made several errors in his notice of deficiency. First, the face page of the notice issued to Mr. Hesse cites additions to tax under sections 6653(a)(1) and (2); however, the amount of the adjustment was calculated under section 6653(b), relating to fraud, rather than section 6653(a) relating *518 to negligence. The attached explanation of adjustments makes clear that the addition to fraud under section 6653(b) is being asserted and we treat the notice accordingly. Second, respondent relies on a statute which was not in effect for 1981, the year in issue. Section 6653(b)(2) was added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), applicable with respect to taxes the last day prescribed by law for payment of which is after September 3, 1982. Sec. 325(a), TEFRA, Pub. L. 97-248, 96 Stat. 324, 616-617. The taxable year in issue in this case is 1981. Accordingly, respondent erroneously determined Mr. Hesse was liable for the addition to tax under section 6653(b)(2) in 1981. Further, in 1981, the 50 percent addition to tax due to fraud was set forth in section 6653(b) and not section 6653(b)(1), as determined by respondent. Petitioners concede that they failed to file their 1981 Federal income tax returns for calendar year 1981, and that Mr. Meares is liable for an addition to tax for negligence under section 6653(a). They further agree that Mr. Hesse is also liable for the addition for negligence, if we find no fraud. After concessions, *519 we must decide: (1) whether petitioners had unreported taxable income for 1981; (2) whether petitioners are liable under section 6654(a) for additions to tax for failure to pay estimated taxes in 1981; (3) whether petitioners are subject to self-employment tax for 1981; (4) whether Mr. Hesse is liable for the addition to tax under section 6653(b) for fraud. [2]
FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petitions were filed, both petitioners resided in California. Both petitioners filed individual Federal income tax returns for the taxable years 1979 and 1980. Before and during calendar year 1981, petitioners were partners in a general partnership known as Space Productions, a music partnership business. The partnership's information return was filed for calendar year 1981. In 1982 petitioners requested and received 4-month extensions to file their individual income tax returns for calendar year 1981. However, the returns *520 were never filed. As a result, respondent, using the cash expenditure method of reconstructing income, determined that Mr. Hesse and Mr. Meares had income of $ 48,971 and $ 48,955, respectively, for calendar year 1981. In his answer, respondent increased the amount of petitioners' respective deficiencies by $ 975 each. This increase represented the 15 pounds of marijuana that petitioners purchased and sold before the drugs were seized on May 15, 1981. Before trial, respondent and petitioners agreed that personal living expenses were $ 500 per month during the period they were out of police custody. The $ 500 represents a lower amount than respondent had originally used in determining the deficiencies. During 1981 Mr. Hesse was out of custody for approximately 9 months, while Mr. Meares was out of custody for 11- 1/2 months. Mr. Hesse filed individual Federal income tax returns for calendar years 1982, 1983, and 1984 around August 1986. Mr. Meares was not required to file an individual Federal income tax return for calendar year 1982, but filed individual income tax returns for 1983 and 1984 in 1985. At the beginning of 1981 petitioners each had cash on hand of $ 1,000. During *521 the early portion of 1981, petitioners were engaged in the illegal activity of buying and selling drugs. In April of 1981, in order to purchase the drugs, petitioners borrowed $ 4,000 cash from a friend named Mr. Ganim, and they orally agreed that it would be repaid in a few months. Petitioners repaid $ 1,200 in 1981. Also, in early 1981, Mr. Hesse borrowed $ 2,000 from Ms. Spielman, an employee of Space Productions and co-owner with petitioners of a house located at 1125 Hayes Street, San Francisco, Calif. (Hayes Street property). Again, there was only an oral agreement that the loan would be repaid. Ms. Spielman was repaid $ 75 in 1981.
During the early part of 1981, petitioners purchased, from three different sellers, the following drugs: (1) 125 pounds of standard grade marijuana from a "Video Bob"; (2) 31 pounds of hashish from a Mr. Steve Alder; and (3) 25 pounds of sinsemilla from a Mr. Fox. Petitioners were equal partners in these purchases, but others contributed approximately $ 10,000 to the enterprise. On the day the hashish was purchased, May 15, 1981, Mr. Hesse received a key from Mr. Alder to a locker located at 390 Townsend Street, San Francisco, Calif. containing *522 the hashish. Mr. Hesse was told by Mr. Alder that there was past due rent on the locker. Mr. Hesse went down to the locker that same day and paid off the past due rent. Police observed him paying the rent on the locker, which was leased to an individual named Tom Kelly. Mr. Hesse signed the payment receipt as "T. Kelly". After Mr. Hesse had placed a new lock on the locker he was arrested for possession of 14,233.2 grams of hashish (approx. 32.8 lbs.) and 1,848.2 grams of marijuana (approx. 4.25 lbs.). Among the items seized from the locker were articles belonging to Martin Meares, petitioner Meares' brother. After his arrest, Mr. Hesse told police more drugs could be found at a warehouse at 1610 Harrison Street, San Francisco, Calif., and at the Hayes Street property. The Harrison Street address was leased by petitioners' partnership, Space Productions. Under a valid search warrant police found 134.6 pounds of marijuana, 320 grams of hashish and 2.25 pounds of psilocybin on the premises. Mr. Meares was arrested at this time. Also, upon a valid search warrant, the Hayes Street property was searched and 659 grams (approx. 1.5 lbs.) of marijuana, 369 grams (approx. .85 lbs. *523 ) of hashish, and small quantities of other controlled substances were seized. On September 9, 1981, petitioners pled guilty to possession of marijuana and psilocybin for the purpose of sale. The total quantity, type, and purchase price of the contraband seized at the 390 Townsend Street and 1610 Harrison Street addresses were as follows: (1) 110 pounds standard grade marijuana at a cost of $ 130 per pound; (2) 25 pounds of special grade marijuana (sinsemilla) at a cost of $ 900 per pound; and (3) 31 pounds of hashish at a cost of $ 600 per pound. Petitioners had previously sold 15 pounds of marijuana, which we find also cost $ 130 per pound. In some cases credit was extended by the sellers. We find the amount of credit was $ 4,000. At the time of their arrest Mr. Hesse possessed $ 2,229 in cash while Mr. Meares possessed $ 2,510 in cash. These amounts were taken by the state for payment of petitioners' individual state income taxes for the period of January 1981 to May 15, 1981, the date of their arrest. After their arrest, Mr. Hesse's then-fiance, Jerilyn Arnold, and Mr. Meares' then-girlfriend, Sarah Devlin, contributed $ 1,500 each to petitioners' support. In 1981 petitioners, *524 along with three other individuals, owned the Hayes Street property. The property was originally purchased, under a wrap-around mortgage, on March 13, 1980, by Mr. Meares and three other individuals from a Mario Arguilles. The four owners were required to make monthly payments of $ 1,081 to Mr. Arguilles in satisfaction of the first mortgage held by California Federal Bank. In connection with the property's purchase Mr. Meares and the three other individuals executed a $ 30,000 note to Mr. Arguilles and secured the note with a second deed of trust on the property. Mr. Arguilles in turn assigned the note (the B-W Note) to two other individuals named Thomas Bertran and Sam Watkins. Payments of $ 325 per month were required to be made by the four owners on the B-W Note. On May 20, 1980, Mr. Meares, along with the other co-owners, transferred the Hayes Street property, by way of Grant Deed, to themselves and Mr. Hesse as tenants in common, in order to add Mr. Hesse as the fifth co-owner. During 1981, 12 payments of $ 1,081 were made by the Hayes Street property owners out of their joint bank account to Mr. Arguilles. Of the total $ 12,972 paid, $ 12,100 represented interest. Also, *525 during 1981 monthly payments of $ 325 were made on the B-W Note, representing all interest at 13 percent, for a total of $ 3,900. During 1981 Mr. Hesse was also employed by Guitar Center Management and earned additional wages in the amount of $ 2,755. ULTIMATE FINDINGS OF FACT Petitioners had the following income in 1981: Gross Income
Hesse
Meares
Expenditures
for drugs
$ 28,675.00 $ 28,675.00 Less credit extended
(2,000.00)
(2,000.00)
Less contributions from
others
(5,000.00)
(5,000.00)
Loan Repayment
637.50 637.50 Living Expenses
4,500.00 5,750.00 Cash in possession
on arrest
2,229.00 2,510.00 Wages
2,755.00 -0- TOTAL
$ 31,796.50 $ 30,572.50 Less Nontaxable Sources
Ganim Loan
2,000.00 2,000.00 Spielman Loan
1,000.00 1,000.00 Support from future spouse
1,500.00 1,500.00 Cash on hand 12/31/81
1,000.00 1,000.00 TOTAL
$ 5,500.00 $ 5,500.00 Less Deductions
State taxes
2,229.00 2,510.00 Mortgage interest: 1st mortgage
2,420.00 2,420.00 2d mortgage
780.00 780.00 Total Deductions
$ 5,429.00 $ 5,710.00 Total Taxable Income
$ 20,867.50 $ 19,362.50 *526 OPINION The first issue we must decide is whether petitioners had unreported taxable income for calendar year 1981. Deficiency Determination
Petitioners alleged in their petitions that the adjustments determined by respondent in the notices of deficiency were arbitrary and without foundation in law or fact; they urged that the burden of going forward should thus be shifted to respondent. However, petitioners did not press this contention at trial or on brief, and we deem it waived. Moreover, respondent has clearly linked petitioners to an illegal income-producing activity, which is all that is required. See Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Adjustments to Deficiency Determination
At trial petitioners presented evidence of nontaxable sources out of which their expenditures could have been made. They also claimed entitlement to several deductions that respondent had not included in his determination. For purposes of resolving the disputed adjustments we shall separate them into the following subparts: (a) whether petitioners had cash on hand December 31, 1980; (b) whether *527 any of the $ 57,350 purchase price of the drugs came from nontaxable sources; (c) whether the nonrepayment of $ 4,725 of the $ 6,000 loans made to petitioners in 1981 is income to them in 1981; (d) whether petitioners each received $ 1,500 support after their arrest in 1981; (e) whether any portion of the $ 1,081 per month payment to Mario Arguilles or the $ 325 per month payment to Mr. Bertran and Mr. Watkins represents deductible interest to petitioners; (f) whether petitioners are entitled to deduct their partnership loss for taxable year 1981. (a) Cash on hand
Mr. Hesse testified that he had had $ 3,200 cash on hand. Mr. Meares claimed to have had $ 2,000. Their testimony is vague and unsupported by documents or third parties. Nevertheless, we believe they did keep substantial cash on hand for use in their music business. We also note that both petitioners had more than $ 2,000 when arrested. We thus think each petitioner had some nontaxable cash on hand as of December 31, 1980. Based on their testimony, lifestyle, and business habits, we find they each had $ 1,000 cash at the beginning of 1981. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). *528 (b) Nontaxable sources used to purchase the drugs
Respondent determined that petitioners expended $ 27,700 each for the purchase of the drugs seized in 1981. However, on brief, respondent refigured the purchase price of the drugs to be $ 28,675, which reflects the 15 pounds of standard marijuana sold by petitioners before May 15, 1981. Respondent has the burden of proving the upward adjustment. Rule 142(a). Since petitioners concede that they originally purchased, and sold, 15 pounds of marijuana more than the amount seized, we find that respondent has met his burden as to the increase. Petitioners have consistently denied that they personally expended the full amount used to purchase the drugs. Instead they contend that five other individuals, besides themselves, contributed money to purchase the drugs and, further, that all three of the drug sellers extended them some amount of credit. Respondent challenges petitioners' assertions that any type of credit arrangements were entered into. Respondent's expert witness, Sergeant Robinson, testified that credit or fronting arrangements are rare. He further testified that the only time such arrangements occur is where *529 the person purchasing the drug, as well as the person supplying the controlled substance, have a long standing, established, and consistent practice of dealing with each other. We find Sergeant Robinson to be a qualified and reliable witness in the area of drug transactions but are not convinced that credit arrangements could not have been made to petitioners. Petitioners have cited us to 12 reported Federal drug cases where credit was granted by dealers, apparently a far more common occurrence than respondent would have us believe. See, e.g., Schneider v. Housewright, 668 F.2d 366 (8th Cir. 1981). Neither do we fully accept petitioners' testimony, which is unsupported by third party witnesses. Petitioners testified that Mr. Hesse had known Mr. Alder for several years and had prior dealings with Mr. Fox. In the third instance a $ 1,000 credit was promptly repaid. We accept this testimony and conclude that some credit was extended. We find that credit to be $ 4,000. See Cohan v. Commissioner, supra.
We also conclude that Marty Meares, petitioner Meares' brother, was a participant, since his personal belongings were found in the locker. *530 Moreover, two of the other participants named by petitioners, Messrs. Souby and Sibdialsan, were arrested with petitioners at the warehouse. Bearing heavily against petitioners because of an inexactitude of their own making, we find that outsiders contributed $ 10,000 to the purchase of the drugs. Cohan v. Commissioner, supra.
(c) Nonpayment of loans received in 1981
On brief, respondent denies that petitioners received loans totaling $ 6,000 from Mr. Ganim and Ms. Spielman, since no written documents establish the existence of the loans. However, we find the testimony of the two nonparty witnesses that petitioners did receive cash loans of $ 6,000 during 1981 to be credible. The loans represent a nontaxable source of income which must be taken into account in calculating petitioners' taxable income under the cash expenditure method. Alternatively, respondent contends that if we find that the transfers took place and that they constituted loans, then, to the extent that they were not repaid in 1981, petitioners received discharge of indebtedness income under section 61(a)(12). We do not agree. The loans made to petitioners were demand loans and *531 not term loans. Neither Mr. Ganim nor Ms. Spielman made demands upon petitioners at any time during 1981 to collect the outstanding balance of the loans. Under California law there is a two-year statute of limitations for obligations not in writing that begins to run from the date the obligation is entered into. Cal. Code of Civ. Proc. sec. 339(1) (West 1973). Since there is no evidence before us that a demand was made during 1981, and since the obligation to repay does not become unenforceable for two years from the date it was entered into, i.e., 1983, we find that no discharge of indebtedness income arose during 1981. (d) Support
Petitioners' living expenses in 1981 were $ 500 per month while they were not in police custody. Mr. Hesse alleges that $ 1,500 of those expenses was paid by his then-fiance, Jerilyn Arnold and, at trial, Mrs. Jerilyn Arnold Hesse testified that during a three-month period after Mr. Hesse had been arrested she expended approximately $ 1,500 toward his support. Even though no documentary evidence was presented at trial that Mrs. Hesse actually supported Mr. Hesse, we find her to be a credible witness and her testimony believable. Mr. Meares *532 testified that Sarah Devlin, his girlfriend before and at the time of his arrest and a co-owner of the Hayes Street house, contributed a total of $ 1,500 toward his support from May 15, 1981, until the end of the year. We find his testimony to be credible. (e) Whether any portion of the $ 1,081 or $ 350 payments represents deductible interest for petitioners
Respondent contends, on brief, that no portion of the $ 1,081 payment to Mr. Arguilles, made by the owners of the Hayes Street property out of their joint account, is deductible interest for petitioners since they failed to show that they paid any portion of the amounts. We disagree. Although petitioners failed to present any documents to substantiate their agreement with Mr. Arguilles regarding the breakdown of the payments between interest and principal, the evidence shows that petitioners were co-owners of the house, each holding a one-fifth undivided interest as tenants in common under California law, Civ. Code sec. 686 (West 1982); that at least 5 payments of $ 1,081 were made to Mr. Arguilles during the year from the owners' joint bank account; and that as of November 1981 all the 1981 monthly payments on the *533 loan between Mr. Arguilles and the California Bank ($ 1,081 per month) had been made. There is no evidence that Mr. Arguilles failed to receive any of the payments for 1981. Petitioners have met their burden of proving that $ 12,100 of interest payments were made in 1981. Accordingly, they are each allowed a deduction of $ 2,420 (1/5 of $ 12,100) for calendar year 1981. With respect to the payments of $ 325 per month, we find that there was a valid Deed of Trust in the amount of $ 30,000 executed by Mr. Meares and three others. Mr. Hesse had an interest in paying the note since he was a 20-percent owner of the house which secured the note. Mr. Meares testified that the $ 350-per-month payments represented 100 percent interest, calculated at a rate of 13 percent. We accept this. Petitioners are therefore each entitled to deduct 1/5 of $ 3,900 or $ 780 each. (f) Deductibility of partnership loss
Petitioners argue that they should be allowed to deduct the amount of loss shown on their 1981 Federal partnership information return. Respondent challenges this deduction on the basis that the partnership loss was not substantiated with any books or records to support the *534 figures stated on the return. Other than Mr. Meares' testimony, no evidence was introduced to support the particular items claimed on the partnership return or how the distributive shares of partnership items were calculated. Petitioners introduced no documents supporting their loss, and they failed to present any witnesses who had personal knowledge of how the return was prepared and what records were used when it was prepared. It is a taxpayer's responsibility to maintain adequate books and records to support the figures that are reported on any return. See sec. 1.446-1(a)(4), Income Tax Regs. Therefore, we agree with respondent that the evidence presented does not support petitioners' claim for the allowance of the deduction of the partnership loss. Self-Employment Taxes
Respondent determined that petitioners were subject to self-employment tax under section 1401. Petitioners have the burden of proof with respect to this issue. Rule 142(a). Petitioners presented no evidence contesting respondent's determination and have, therefore, failed to carry their burden of proof with respect to this issue. Having found that petitioners had unreported income during 1981, we *535 find petitioners are subject to self-employment tax. Failure to Pay Estimated Tax
The next issue for decision is whether petitioners are liable for the addition to tax under section 6654(a) for failure to pay estimated tax. Once a deficiency has been established, section 6654 is automatic unless one of the statutory exceptions applies. Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). None of the exceptions applies here. We hold for respondent. Fraud
The next issue for decision is whether Mr. Hesse is liable for the addition to tax for fraud under section 6653(b). Respondent determined that Mr. Hesse is liable for the addition to tax for fraud under section 6653(b). Petitioner denies that he intended to evade paying his taxes for 1981. Respondent has the burden of proof on this issue. Rule 142(b). Section 6653(b) [3] provides for an addition to tax equal to 50 percent of the underpayment if any part of such underpayment is due to fraud. Since fraud can never be imputed or presumed, respondent must prove, by clear and convincing evidence, that an underpayment exists and that some portion of the underpayment is due to fraud. See sec. *536 7454(a) and Beaver v. Commissioner, 55 T.C. 85 (1970). However, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for the year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. To meet this burden, respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). *537 Since direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Spies v. United States, 317 U.S. 492 (1943). The presence or absence of a fraudulent intent is usually determined by close examination of the taxpayer's whole pattern of conduct and such intent to conceal or mislead may be inferred from such conduct. See Spies v. United States, 317 U.S. at 499. In this case, Mr. Hesse had unreported income from an illegal activity, failed to file his individual tax return and pay his taxes for 1981, and failed to maintain adequate books and records. We are not persuaded that in this case such circumstantial evidence establishes fraud by clear and convincing evidence. The mere failure to file is not sufficient to establish fraud. Kotmair v. Commissioner, 86 T.C. 1253 (1986). Such failure occurred only once. Mr. Hesse cooperated with the police and with state authorities. He has not made misleading statements to respondent nor concealed assets. We hold that respondent failed to meet his burden of proving fraud against Mr. Hesse. *538 We accept petitioners' concessions that they are each liable for negligence. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for 1981, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the portion of the underpayment attributable to fraud. ↩
*. 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations.↩
*. 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
2. Petitioners also requested attorney's fees under sec. 7430. That request is premature. See Rule 231(a)(2).↩
3. Sec. 6654(b) as in effect for taxable year 1981 is as follows: (b) FRAUD - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment * * *.↩